JS6

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan H. Lefkow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 7489 | **DATE** | 3/23/2004 |
| **CASE TITLE** | Scott, et al. vs. Arrow Chevrolet. Inc. | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendant's motion for summary judgment [48-1] is granted. Judgment entered in favor of the defendant.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | 3 | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | number of notices | |
| | No notices required. | | | |
| ✓ | Notices mailed by judge's staff. | | MAR 2 4 2004 | |
| | Notified counsel by telephone. | | date docketed | 114 |
| | Docketing to mail notices. | | JXM | |
| ✓ | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 3/23/2004 | |
| MD | courtroom deputy's initials | | date mailed notice | |
| | | | MD | |
| | | Date/time received in central Clerk's Office. | mailing deputy initials | |

DOCKETED

MAR 2 4 2004

| | | |
|---|---|---|
| RONNIE SCOTT, TOMMIE J. WILLIAMS, | ) | |
| JACKY BURKS, and DERRICK JOHNSON, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 01 C 7489 |
| | ) | Judge Joan H. Lefkow |
| ARROW CHEVROLET, INC., | ) | |
| an Illinois Corporation | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs, Ronnie Scott, Tommie J. Williams, Jacky Burks, and Derrick Johnson (who later accepted an offer of judgment), have filed a four-count Second Amended Complaint against defendant, Arrow Chevrolet, Inc. ("Arrow"). All of the plaintiffs allege that Arrow discriminated against them because of their race (black) in terms and conditions of employment, by failing to promote them, and by terminating their employment, all in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (Count I), and of section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 (Count II). Scott also alleges that Arrow retaliated against him for agreeing to support Burks in filing a charge of discrimination against Arrow (Count III). Williams alleges that Arrow retaliated against him after he complained to Arrow's managers and supervisors about racial and religious discrimination (Williams is Muslim) in the terms and conditions of his employment (Count IV). The plaintiffs filed charges with the Equal Employment Opportunity Commission ("EEOC") on August 9, 2000 (Williams), October 12, 2000 (Burks), and October 27, 2000 (Scott). On June 29, 2001, the EEOC issued to all of the

plaintiffs "Notice of Right to Sue" letters. Before the court is Arrow's Motion for Summary Judgment on all claims. For the reasons stated below, Arrow's motion is granted.

## SUMMARY JUDGMENT STANDARDS

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). To determine whether any genuine fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed R. Civ. P. 56(c) Advisory Committee's notes. The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323 (1986). In response, the non-moving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A material fact must be outcome determinative under the governing law. *Insolia*, 216 F.3d at 598-599. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver* v. *Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the non-moving party as well as view all reasonable inferences in that party's favor. *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The court must apply the summary judgment standard with "added rigor" in employment discrimination cases, where intent is the central issue. *Kralman* v. *Illinois Dept. of Veterans' Affairs*, 23 F.3d 150, 152 (7th Cir. 1994).

# FACTS[1]

Plaintiffs are all African-American males. Arrow is an automobile dealership doing business in Midlothian, Illinois. (Def. L.R. 56.1 ¶ 1, 2.) Phil Fagan ("Fagan") was general manager of Arrow in June and July, 2000. (Pl. Stat. of Add'l Facts ¶ 76.) Employees in the finance department at Arrow are considered managers. (*Id.* ¶ 13.)

Arrow allows its salespeople to drive demonstrator vehicles ("demos") from Arrow's inventory. (Def. L.R. 56.1 ¶ 99, 102.) In or around 1999 and 2000, Cavaliers and Trackers were considered low quality demos; Malibus and Luminas were considered "middle-of-the-road" demos; and Monte Carlos and Impalas were considered high-end demos. (*Id.* ¶ 105.) When determining what model of automobile it would issue to salespeople as demos, Arrow claims that it considers such factors as the availability of the model and the longevity and performance of the salesperson. (*Id.* ¶ 103, 104.) A salesperson's demo could sometimes be downgraded based on

---

[1]The court compiled the facts for this section from the parties' Local Rule 56.1(a)(3) and (b)(3) Statements of Material Facts and attached exhibits. In their Local Rule 56.1 Statement of Additional Facts, plaintiffs repeatedly put forth general, conclusional statements. For example, in paragraph 10, plaintiffs proffer the assertion that "Arrow Chevrolet treated non-black employees differently than blacks when it came to attendance, tardiness, and fines." In paragraph 38, plaintiffs state, "Non-minority managers received more thorough and complete training in their new management roles." These statements, and many others, are inadequate. Such statements fail to provide the court with any of the evidence -- the who, what, where, and when -- that would permit the trier of fact to draw the same conclusion. Furthermore, adding the qualifier that an individual "personally witnessed" allegedly discriminatory behavior, such as in plaintiffs' statement in paragraph 86 that "Alcorn personally witnessed demo cars being assigned and taken away on the basis of race," does not change a conclusion into a fact.

Federal Rule of Civil Procedure 56(e) requires a party responding to a motion for summary judgment to "set forth *specific* facts showing there is a genuine issue for trial." Conclusional statements of fact should be afforded no weight at the summary judgment stage. *Lujan* v. *Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)(emphasis added); *Gabrielle M.* v. *Park-Forest-Chicago Heights, Ill. Sch. Dist. 163*, 315 F.3d 817, 822 (7th Cir. 2003)("The non-movant must allege *specific* facts creating a genuine issue for trial and may not rely on vague, conclusory allegations."). In many instances, plaintiffs have failed to do this. Accordingly, the court does not incorporate the following paragraphs from plaintiffs' Statement of Additional Facts into this section: 8 (sentence 1), 10, 32, 33, 38, 44, 54 (sentence 1), 55, 62 (sentence 1), 70, 86, 88, 89, and 91. In addition, paragraph 4 is inadmissible hearsay and is stricken. *See Winskunas* v. *Birnbaum*, 23 F.3d 1264, 1268 (7th Cir. 1994)(hearsay is incapable of creating a genuine issue of material fact).

inventory and availability. (*Id.* ¶ 106.) During their employment at Arrow, plaintiffs were issued the following demos:

Burks: Cavalier, Malibu, Lumina, Monte Carlo.

Scott: Cavalier, Malibu, Prism, Monte Carlo, Impala.

Williams: Cavalier, Malibu, Monte Carlo.

(*Id.* ¶ 109.)

The use of demos is subject to the demo rules signed by each salesperson. Each of the plaintiffs drove demos while working for Arrow and signed "Demo Rules" or "Demonstrator Agreements" agreeing to be bound by the demo rules. (*Id.* ¶ 101.) According to Arrow's company policy, an employee turning in a demo must have it checked in by a manager. The manager and employee then inspect the demo for damage. A demo damage sheet is filled out and signed by the manager and employee. The employee is then charged for any damage. (*Id.* ¶ 44.) Salespeople are not allowed to have demos while on medical leave. (*Id.* ¶ 100.)

### A. Jacky Burks

Burks was first employed at Arrow in September, 1987. (Pl. Stat. of Add'l Facts ¶ 2.) Burks was terminated and later rehired by Arrow several times throughout the years. (*Id.* ¶ 7.) Burks was most recently re-hired in December, 1997, as a used car salesperson. (Def. L.R. 56.1 ¶ 27.)

Arrow does not use a time clock to keep track of employees' arrival and departure times. Rather, "if management says an employee is late, [that employee is] considered late." (Pl. Stat. of Add'l Facts ¶ 9.) Burks claims that he has been fined for being late even though he was not late. (*Id.*)

4

In October, 1999, Burks claims that "all of the white managers at Arrow" decided to fire him. The minority managers, however, refused to vote to fire Burks. Burks called Cary Frank ("Frank"), an owner of Arrow, and informed him that "they were trying to terminate" him. Frank and Burks then participated in a conference call to find out why the management was trying to fire Burks. Jimmy Samhan ("Samhan"), a white manager, claimed Burks was "bad mouthing" the company. Frank asked for a specific example of what Burks had said about the company, but no manager provided an example.[2] (Id. ¶ 25.)

Burks claims that he was denied Saturday morning "spiffs" because the management claims that he had set up his "rat" friends to come in.[3] (Pl. Stat. of Add'l Facts ¶ 35.) However, on at least one occasion, Burks won a "King of the Hill" contest and received an $8500 bonus. (Def. L.R. 56.1 ¶ 36.) Burks also claims that he has been passed over for a promotion on multiple occasions by non-black employees including Andy Bellavia, Allen Mahea, "Mogce," Andy Mahares, Kelly Zimmerman, and Mickey Ellison. (Pl. Stat. of Add'l Facts ¶ 36.) Burks alleges that when he asked Gary Dunn, Burks' supervisor at the time, "what do we have to do to get promoted around here," Dunn replied "be lighter than a paper bag."[4] (Burks Dep. at 122.)

---

[2] Arrow moves to strike all references to this conversation, claiming that it is inadmissible hearsay. All the participants in the conversation were employees of Arrow. Thus, the statements are admissions by party-opponents and therefore not hearsay. Fed. R. Evid. 801(d)(2).

[3] A "spiff" is an incentive bonus given to sales people to promote sales and motivate the sales staff. (Def. L.R. 56.1 ¶ 110.) Some finance managers at Arrow referred to "black customers with poor credit" as "rats." (Pl. Stat. of Add'l Facts ¶ 75.)

[4] Burks does not specify when Dunn made this comment. However, Joseph Nash testified that Gary Dunn did not work at Arrow at any point during Nash's employment at Arrow. (Nash Dep., at 81-2.) Nash started working at Arrow in 1996 and worked there without interruption at least through 2003. (Id. at 102.) Thus, Dunn's comment to Burks must have occurred in 1996 or before.

In 2000, Burks had surgery on his foot. Burks' doctor gave him a note explaining that Burks should limit his walking and standing and should refrain from exerting long-term pressure on his foot. Burks gave a copy of the note to Jerry Wickman at Arrow. (*Id.* ¶ 27.) Burks was forced to cut his working time from 50-60 hours per week to 20-30 hours per week. As a result of cutting back on his working hours, Burks' car sales were lower. (*Id.* ¶ 26.) Burks states in his deposition that he was fired on May 1, 2000. (Burks Dep., at 87.) However, Arrow describes Burks' absence from May to July, 2000, as "medical leave." (Def. L.R. 56.1 ¶ 28.) The record does not clarify what Burks' official employment status was from May 1 to mid-July, 2000.

Burks had a second foot surgery in the middle of May, 2000, and was instructed by his doctor that he should not work for six to eight weeks. (*Id.* ¶ 28.) Before he took this absence, Burks was required to return his demo and have it inspected by Arrow's service department to assess whether any damage had been done to the vehicle. (Pl. Stat. of Add'l Facts ¶ 29.) Burks claims that he followed all the proper procedures when he checked in the demo and that the demo had no damage when he returned it to Arrow. (*Id.* ¶ 29, 30.) However, Burks' signature does not appear on the demo check-in inspection report. (Def. L.R. 56.1 ¶ 42; Def. Ex. F.) Arrow claims that Burks left the demo on the lot without reporting it to anyone. (*Id.* ¶ 29.) Arrow claims that when it found the car, it had $467.30 in damages from cigarette burns on the driver's side floor. (*Id.* ¶ 30.)

When Burks returned from medical leave around July 19, 2000, Fagan presented Burks with a bill for the damage Burks had allegedly done to his previous demo and told Burks that he would be required to pay for the damage to the old demo before Arrow would issue Burks a new demo. (*Id.* ¶ 31.) Burks denies that Fagan presented him with a bill for the alleged damage to the

6

demo. (Pl. Resp. to Def. L.R. 56.1 ¶ 31.) Arrow claims that Burks refused to pay for the damage and walked out of work. He then called in the next day and stated that he would be in to work as soon as he could get a ride. (*Id.*) However, Burks did not show up for work that day. (Def. L.R. 56.1 ¶ 32.) Burks called Frank on July 21, 2000. Frank attempted to broker a compromise where Burks would pay $250 for the alleged damage to the demo, but Burks refused. (*Id.* ¶ 33.) According to Burks, Franks then told him that he did "not like getting between" Burks and Franks' managers and that Burks should "find someplace else to work." (Pl. Stat. of Add'l Facts ¶ 31.) As Burks understood it, this meant that he was fired. (Burks Dep., at 97.) Arrow claims that Frank told Burks that if he could not show up for work he would be fired. When Burks did not show up for work again, Arrow considered his employment terminated. (Def. L.R. 56.1 ¶ 34.)

Burks filed an EEOC Charge of Discrimination against Arrow on October 12, 2000. In his charge, he stated

> I was hired by Respondent in September of 1987. I have been rehired and terminated by Respondent approximately eight times since my date of hire. I was terminated on May 1, 2000, but then allowed to remain employed as I was on medical leave. I was most recently terminated on or about July 22, 2000. During my course of employment at Respondent, I was continuously subjected to racial harassment and different terms and conditions of employment such as paying more for demo damage than the non-Black employees.
>
> I believe that I have been discriminated against because of my race, Black, in violation of Title VII of the Civil Rights Act of 1964, as amended.

In his charge of discrimination, Burks identified December 8, 1999, as the earliest date discrimination took place. Burks admits that he did not ask Scott or Johnson to be a witness in his EEOC charge before he filed the charge. (Burks Dep. II, at 25.)

## B. Tommie Williams

Williams was first employed by Arrow in 1988 but quit around 1992. (Def. L.R. 56.1 ¶ 49, 50.) He was rehired in 1997. (*Id.* ¶ 50.) Williams claims that he was subjected to racial slurs on a daily basis while he worked at Arrow. (*Id.* ¶ 57.)

Williams is a Muslim and a member of the Nation of Islam. (Pl. Stat. of Add'l Facts ¶ 48.) While employed at Arrow, Jimmy Samhan, who is also a Muslim, asked Williams to go to Salaam Restaurant, a Muslim restaurant operated by African Americans, and get pork chops. (*Id.* ¶ 49.) On a different occasion, after seeing Williams with a female Muslim customer wearing traditional Muslim dress, Arrow business manager Bob Williams asked Williams what would happen if he "pulled his dick out and shook it in her face." Williams reported the statement to Fagan. (*Id.* ¶ 51.)

Williams claims that he has been passed over for promotion by several white employees. (*Id.* ¶ 52.) In a letter dated February 5, 1999, Williams wrote Fagan asking why five white employees had been promoted to managerial positions ahead of him. (*Id.* ¶ 46.) In August, 1999, Williams was promoted to sales manager. (Def. L.R. 56.1 ¶ 52.)

Williams claims that Gus Kay, whose position is not identified, asked him what part of Chicago he lived in prior to assigning him a demo. Kay told Williams that he was only eligible for a certain type of car because of where he lives. (Pl. Stat. of Add'l Facts ¶ 54.) From 1999 to 2000, Williams was assigned a Monte Carlo as his demo. (Def. L.R. 56.1 ¶ 58.)

On Friday, October 28, 1999, Arrow General Manager Bob Hammann ("Hammann") received a complaint from a customer regarding a car deal in which Williams had worked. On October 29, 1999, Hammann questioned Williams about the way the deal worked. The

8

conversation escalated into an argument, and Hammann suspended Williams for the day. (Def. L.R. 56.1 ¶ 53.) Williams never worked at Arrow again. Arrow claims Williams quit soon after his argument with Hammann. (*Id.* ¶ 54.) Williams claims that he was terminated by Frank the following Monday or Tuesday. (Pl. Resp. to Def. L.R. 56.1 ¶ 54.)

Williams filed an EEOC Charge of Discrimination against Arrow on August 9, 2000. In his charge, he stated

> I was employed by the Respondent since January 1988. During my employment I was subjected to racial and religious harassment. I was also subjected to different terms and conditions of employment. I was disciplined on several occasions for allegedly coming in late. On numerous occasions I was denied promotions. On or about July 1999 I made a protected complaint. On or about August 1999 I was promoted. On or about November 1999 I made another protected complaint. On or about December 1999 I was discharged.
>
> I believe that I have been discriminated against because of my race, Black, and religion, Muslim, and retaliated against in violation of Title VII of the Civil Rights Act of 1964, as amended.

In his charge of discrimination, Williams did not identify an earliest date discrimination took place.

### C. Ronnie Scott

Scott began working at Arrow in 1998 as a new car salesman. (Def. L.R. 56.1 ¶ 60.)

Scott claims that he was assigned a Cavalier demo, while another employee, Allen Mejia, was assigned a Malibu and a Monte Carlo. (Pl. Stat. of Add'l Facts ¶ 63.) Scott claims that Bob Hammann would not allow him to drive any demo of higher quality than a Malibu, while another employee, Jimmy Mazzulla, was assigned a Monte Carlo as soon as he was rehired at Arrow. (*Id.* ¶ 64.) However, at some point Scott must have been assigned a Monte Carlo because he claims

that he was forced to pay a $250 deductible when the Monte Carlo was stolen from the Arrow lot. (*Id.* ¶ 68.)

During a conversation in July, 1999, Hammann instructed Scott, who is Christian, not to wear a bow tie to work. Hammann explained bow ties are associated with Muslims, and people do not like Muslims. (*Id.* ¶ 67.)

Scott claims that Hammann threatened him so often that Scott had a "skeletal muscular spasm" in 1998 and was taken to the hospital in an ambulance. Scott was prescribed medicine for stress-related attacks and was admitted to the hospital three times. (*Id.* ¶ 69.)

In February, 2000, Scott was promoted to finance manager. (Def. L.R. 56.1 ¶ 61.) Arrow claims that the commission percentage paid to a finance manager is based on the manager's experience in finance. More experienced finance managers received a higher percentage, with the finance director receiving the highest percentage. (*Id.* ¶ 63.) Scott claims that a finance manager's commission is based on factors other than experience. (Pl. Resp. to Def. L.R. 56.1 ¶ 63.) From February, 2000, to July, 2000, Scott was paid a 3% commission on the total revenue generated by the finance department. (Def. L.R. 56.1 ¶ 65.) Arrow claims that this percentage was the same as that received by all other new finance managers. (*Id.* ¶ 64.) Scott claims that it was not the same because other new finance managers were given "additional perks." (Pl. Resp. to Def. L.R. 56.1 ¶ 64.) In May, June, and July, 2000, the highest paid employee in the finance department was Scott's supervisor, Joe Nash ("Nash"), who is African American. (Def. L.R. 56.1 ¶ 66.)

Arrow trains its new finance managers on-the-job. Nash trained Scott on multiple occasions, including several Sundays when the dealership was closed. (*Id.* ¶ 67.) Arrow claims

that Scott received more training than anyone else in the finance department during his employment at Arrow. (*Id.*) Scott claims that he received less training than Allen Mejia, Jim Murray, and other employees. (Pl. Resp. to Def. L.R. 56.1 ¶ 67.)

Scott admits that no one other than Hammann ever directed racial slurs at him. According to Scott, Hammann would joke about O.J. Simpson, Michael Jackson, Louis Farrakhan and Al Sharpton. Scott also claims that he heard Samhan ask a group of African-American employees if they were having a Gangster Disciples meeting. He also claims that he heard Samhan refer to a customer as a "nigger." (Def. L.R. 56.1 ¶ 72.)

In July, 2000, Scott was the lowest performing employee in the finance department. The other finance managers in July, 2000, were Allen Meija and Ron Schultz. Schultz's sales were $60,713 in July; Meija's, $68,773; and Scott's, $51,237. (Def. L.R. 56.1 ¶ 69.)

Arrow claims that Scott was removed from his position in the finance department because of his lack of interest in finance, his solicitation of employment at other dealerships, and because "his numbers were slipping." (*Id.* ¶ 70.) Arrow claims that Scott was offered a position in sales, but Scott declined. (*Id.* ¶ 71.) Scott claims he was terminated by Nash without being offered any other position. (Pl. Resp. to Def. L.R. 56.1 ¶ 71.) Scott testified that before he was terminated, he had no knowledge that Burks was going to file a charge of discrimination against Arrow. (Scott Dep., at 219.)

Scott filed an EEOC Charge of Discrimination against Arrow on October 27, 2000. In his charge, he stated

> I was hired by Respondent on September 14, 1998 as a salesman. On February 8, 2000, I was promoted to a Finance Manager. Throughout my employment, I was subjected to racial harassment. I was not paid as much as the non-Black Finance

11

Managers. I was also denied raises in April and June and denied C.S.I. bonuses. I was subjected to different terms and conditions of employment in that I was not trained in the same manner as the non-Black Finance Managers. On or about September 30, 2000, respondent received a request for a personal file of a co-worker. On August 1, 2000, I was terminated.

I believe that I have been discriminated against because of my race, Black, and retaliated against in violation of Title VII of the Civil Rights Act of 1964, as amended.

In his charge of discrimination, Scott identified December 8, 1999, as the earliest date discrimination took place.

## Discussion

### I. Plaintiffs' EEOC Charges

As an initial matter, the court must address Arrow's argument that the plaintiffs' allegations in their Second Amended Complaint ("SAC") are not within the scope of their respective EEOC charges. Generally, a Title VII plaintiff cannot bring claims in a lawsuit that were not included in his EEOC charge. *Alexander* v. *Gardner-Denver Co.*, 415 U.S. 36, 47 (1974). This rule serves the dual purpose of affording the EEOC and the employer an opportunity to settle the dispute through conference, conciliation, and persuasion and of giving the employer some warning of the conduct about which the employee is aggrieved. *Cheek* v. *Western & Southern Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994). Allowing a complaint to encompass allegations outside the ambit of the predicate EEOC charge would frustrate the EEOC's investigatory and conciliatory role, as well as deprive the charged party of notice of the charge. *Id.*

12

Nevertheless, because most EEOC charges are completed by laypersons rather than by lawyers, a Title VII plaintiff need not allege in an EEOC charge each and every fact that combines to form the basis of each claim in his complaint. *Id.* A plaintiff may pursue a claim not explicitly included in an EEOC complaint if his allegations fall "within the scope of the charges contained in the EEOC complaint." *Cheek* v. *Peabody Coal Co.*, 97 F.3d 200, 202 (7th Cir. 1996). To determine whether the allegations in the complaint fall within the scope of the earlier EEOC charge, the court looks to whether they are "like or reasonably related to" those contained in the EEOC charge. *Id.* If they are, the court then asks whether the current allegations reasonably could have been developed from the EEOC's investigation of the charges before it. *Id.*

Arrow argues that the plaintiffs make allegations in the SAC that neither were explicitly included in their respective EEOC charges nor are "like or reasonably related" to the allegations in their EEOC charges. The court examines Arrow's argument with respect to each plaintiff in turn.

### A. Jacky Burks

In the SAC, Burks alleges that Arrow subjected him to a hostile work environment, denied him equal terms and conditions of employment, failed to promote him, and terminated his employment because of his race. In the "Statement of Facts" section of the SAC, Burks specifically alleges that Arrow discriminated against him by accusing him of improperly turning in his demo, assigning him lesser quality demos than non-black employees, denying him promotions, bonuses, and training, and treating him differently when on medical leave.

Arrow argues first that Burks cannot bring a Title VII claim for a hostile work environment, because Burks alleged racial harassment, not hostile work environment, in his

13

EEOC charge. The court disagrees. Burks alleged in his EEOC complaint that he was "continuously subjected to racial harassment." While Arrow correctly points out that "co-worker harassment" and hostile work environment are different claims with different elements of proof, *see Mason* v. *Southern Illinois University in Carbondale*, 233 F.3d 1036, 1041-42 (7th Cir. 2000), racial harassment, even harassment by a co-worker, can form the factual basis for a hostile work environment claim if the harassment is sufficiently intense to create an "intimidating, hostile, or offensive working environment" and if the plaintiff can show a basis for employer liability. *See Parkins* v. *Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1032 (7th Cir. 1998). Burks does not need to invoke the magic words "hostile work environment" in his EEOC charge to bring such a claim in a Title VII lawsuit. The EEOC charge of racial harassment and the SAC claim of hostile work environment stem from the same underlying factual allegation -- that Burks was subjected to continuous racial harassment when he was employed at Arrow. Thus, Burks' hostile work environment claim is "like or reasonably related to" his EEOC charge of racial harassment.

Next, Arrow argues that Burks' allegations that Arrow discriminated against him by accusing him of improperly turning in his demo, assigning him a lesser quality demo than non-black employees, denying him promotions, bonuses, and training, and treating him differently when on medical leave are all barred because Burks did not include them in his EEOC charge. However, a Title VII plaintiff need not allege in an EEOC charge each and every fact that combines to form the basis of each claim in his complaint. *Cheek*, 31 F.3d at 500. Burks alleged in his EEOC charge that he was "continuously subjected to . . . different terms and conditions of employment such as paying more for demo damage than non-Black employees." The actions alleged in the SAC are specific examples of Burks' general allegation that he was

subjected to different terms and conditions of employment at Arrow. Thus, the claims in the

SAC are "like or reasonably related" to the allegations in Burks' EEOC charge. Furthermore, the

specific allegations in the SAC reasonably could have been developed from the EEOC's

investigation of Burks' charge that he was subjected to different terms and conditions of

employment than non-black employees.

Finally, Arrow argues that Burks did not allege that he was terminated because of his race

in his EEOC charge. Arrow is correct that Burks did not directly state that he was terminated

because of his race. However, in the first paragraph of his EEOC charge, he stated that he was

"most recently terminated on or about July 22, 2000." The second paragraph begins, "I believe I

have been discriminated because of my race . . . ." Any fair reading of the EEOC charge as a

whole would conclude that the latter sentence refers to the former. Thus, Burks' claim that he

was terminated because of his race was included in his EEOC complaint.

### B. Tommie Williams

In the SAC, Williams alleges that Arrow subjected him to a hostile work environment,

denied him equal terms and conditions of employment, failed to promote him, and terminated his

employment because of his race. Williams also alleges that Arrow terminated him in retaliation

for making protected complaints to Arrow's managers in September, October, and November,

1999, about racial and religious discrimination. In the "Statement of Facts" section of the SAC,

Williams specifically alleges that Arrow discriminated against him by assigning him lesser

quality demos than non-black employees and by denying him promotions, bonuses, and training.

Like Burks, Williams can bring a claim under Title VII for hostile work environment

because he alleged in his EEOC charge that he "was subjected to racial and religious harassment"

15

at Arrow. Furthermore, Williams can bring a claim under Title VII for the denial of equal terms and conditions of work, including his claims that Arrow assigned him lesser quality demos than non-black employees and denied him promotions, bonuses, and training, because he alleged in his EEOC charge that he was "subjected to different terms and conditions of employment. I was disciplined on several occasions for allegedly coming in late. On numerous occasions I was denied promotions." Finally, Williams alleges in his EEOC charge, "On or about December 1999 I was discharged." In the next sentence, Williams states, "I believe that I have been discriminated against because of my race, Black, and religion, Muslim . . . ." Thus, like Burks, Williams can bring a claim under Title VII for discriminatory discharge.

Arrow argues, however, that Williams cannot bring claims for retaliation based on his alleged "protected complaints of racial and religious discrimination." First, Arrow argues that Williams did not allege in his EEOC complaint that he was terminated because he made protected complaints. Williams did allege, however, that he had made protected complaints, that he was discharged, and that he believed he had been retaliated against. Williams' allegation that he was retaliated against clearly refers to his allegation that he made protected complaints. There is no other explanation for the modifier "protected." Second, Arrow points out that Williams claims in his EEOC charge that he made protected complaints in July, 1999, and in November, 1999, but the facts show that Williams was not employed at Arrow after October 28, 1999. Thus, he could not have made a protected complaint in November, 1999. Furthermore, the SAC alleges that Williams made protected complaints of racial and religious discrimination in September, October, and November, 1999. Neither the September or October complaints were mentioned in Williams EEOC charge. Nevertheless, in both his EEOC charge and the SAC,

16

Williams alleges that he was terminated in retaliation for making protected complaints. Though the dates on which he alleges he made the complaints are different, the adverse employment action alleged -- retaliatory termination -- is identical. The exact dates of the complaints could have been discovered through the EEOC investigation. Thus, Williams may bring that claim under Title VII.

### C. Ronnie Scott

In the SAC, Scott alleges that Arrow subjected him to a hostile work environment, denied him equal terms and conditions of employment, failed to promote him, and terminated his employment because of his race. Scott also alleges that Arrow retaliated against him for agreeing to support Burks in filing a charge of discrimination against Arrow. In the "Statement of Facts" section of the SAC, Scott alleges that Arrow discriminated against him by assigning him lesser quality demos than non-black employees and by denying him promotions, bonuses, and training.

Like Burks and Williams, Scott can bring a claim under Title VII for the denial of equal terms and conditions of work, including his claims that Arrow assigned him lesser quality demos than non-black employees and denied him promotions, bonuses, and training, because he alleged in his EEOC charge that he was "not paid as much as non-Black finance managers," that he was "denied raises in April and June and denied C.S.I. bonuses," and that he was "subjected to different terms and conditions of employment in that I was not trained in the same manner as non-Black finance managers." Also, Scott can bring Title VII claims for discriminatory termination and hostile work environment for the same reasons that Burks and Williams can bring such claims.

17

Finally, Scott can bring a Title VII claim for retaliatory termination. In the first paragraph of his EEOC charge, Scott alleges that "On or about September 30, 2000, respondent received a request for a personal file of a co-worker. On August 1, 2000, I was terminated." In the second paragraph, Scott alleges that he has been retaliated against by Arrow. Although this is not a model of clarity, one reading the charge fairly would conclude that the allegation of retaliation in the second paragraph refers to Scott's termination following Arrow's receipt of a request for a personal file of one of Scott's co-workers.

Finding that the plaintiffs Title VII claims are "like or reasonably related" to the allegations in their EEOC charges, however, does not necessarily save all plaintiffs' allegations. 42 U.S.C. § 2000e-5(e)(1) requires that a Title VII plaintiff file a charge with the Equal Employment Opportunity Commission ("EEOC") either 180 or 300 days after the alleged unlawful employment practice occurred. In Illinois, a claim is time barred if it is not filed within 300 days. *See Nat'l R.R. Passenger Corp.* v. *Morgan*, 536 U.S. 101, 109 (2002).

Each discrete act of discrimination, such as termination, failure to promote, denial of transfer, or refusal to hire, constitutes a separate actionable "unlawful employment practice." *Id.* at 114. As the Supreme Court explained in *Morgan*,

> [D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act. The charge, therefore, must be filed within the 180- or 300-day time period after the discrete discriminatory act occurred.

*Id.* at 113. Plaintiffs allege numerous discrete acts that fall outside the statutory time period. None of these alleged acts constitute a separate actionable unlawful employment practice under

Title VII. Thus, all alleged discrete violations of Title VII that occurred before the following dates are time-barred:

Burks: December 17, 1999

Williams: October 14, 1999

Scott: January 1, 2000

Hostile environment claims, however, are "different in kind from discrete acts. Their very nature involves repeated conduct." *Id.* The unlawful employment practice therefore "cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." *Id.* A plaintiff may recover under a hostile work environment theory for acts that occurred more than 300 days before the plaintiff filed an EEOC charge provided those acts were part of the same hostile work environment and at least one of the acts occurred within the 300-day period. *Kessel* v. *Cook County*, 00 C 3980, 2003 WL 21011751, at *2-3 (N.D. Ill. May 5, 2003). Thus, plaintiffs may recover under a hostile work environment theory for acts that occurred before the 300-day period.

Plaintiffs seem to contend, though their argument is by no means clear, that this means that they may also recover for discrete discriminatory acts that occurred outside the statutory time period because such acts were part of a hostile work environment. This is clearly contrary to *Morgan*. Discrete discriminatory acts that occurred outside the statutory time period may be considered in determining liability, but only insofar as they constitute evidence of a hostile work environment. *Morgan*, 536 U.S. at 113 (The statute does not "bar an employee from using prior

acts as background evidence in support of a timely claim."). They cannot constitute an independent basis for liability.

Furthermore, to constitute evidence of a hostile work environment, an act must have been "part of the same hostile work environment." *Kessel* v. *Cook County*, 2003 WL 21011751, at *2-3. Both Burks and Williams were employed intermittently at Arrow. Burks does not identify the specific periods of employment prior to December, 1997, and Williams asserts that he worked from 1998 to about 1992 and went back to Arrow in 1997. Although there might be situations in which intermittent employment would constitute "the same hostile work environment," the five-year interim period for Williams and Burks' inability to specify even when he previously worked for Arrow defeat any basis for that conclusion here. Thus, only those acts that occurred during their final period of employment at Arrow will be considered "part of the same hostile work environment" for purposes of the hostile work environment analysis.[5]

## II. Section 1981 Statute of Limitations

The statute of limitations for § 1981 claims is two years. *Jones* v. *R.R. Donnelley & Sons Co.*, 305 F.3d 717, 728 (7th Cir. 2002), *cert. granted*, 123 S. Ct. 2074 (2003). Plaintiffs filed their original complaint in this matter on September 21, 2001. Thus, any claims arising from discrete acts of discrimination, retaliation, or harassment that occurred prior to September 21, 1999, are time barred. However, the reasoning of *Morgan* dictates that plaintiffs may recover under § 1981 for a hostile work environment that included acts that occurred more than two years

---

[5]Because the record is unclear as to whether Burks was terminated on May 1, 2000, or if his absence from May to July, 2000, was due to "medical leave," the court will consider Burks' employment at Arrow from December, 1997, to July, 21, 2000, as a single period of employment for the purposes of this motion.

before the plaintiffs filed their complaint provided those acts were part of the same hostile work environment and at least one of the acts occurred within the two year period.

## III. Merits

Plaintiffs allege that Arrow discriminated against them because of their race in the terms and conditions of their employment, by failing to promote them, and by terminating their employment. They also allege that Arrow subjected them to a hostile work environment. Scott alleges that Arrow retaliated against him for agreeing to support Burks in filing a charge of discrimination against Arrow. Williams alleges that Arrow retaliated against him after he complained to Arrow's managers and supervisors about racial and religious discrimination in the terms and conditions of his employment.

### A. Terms and Conditions of Employment, Denial of Promotion, Bonuses, and Training, Termination, and Retaliation

When a plaintiff alleges intentional discrimination, Title VII and § 1981 actions have the same liability standards, and they are analyzed in the same manner. *Eiland* v. *Trinity Hosp.*, 150 F.3d 747, 750 (7th Cir. 1998). A plaintiff may prove employment discrimination using either the "direct method" or the "indirect method." Under the direct method of proof, a plaintiff may show, by direct or circumstantial evidence, that his employer's decision to take an adverse job action was motivated by the employee's race. *Cerutti* v. *BASF Corp.*, 349 F.3d 1055, 1060-61 (7th Cir. 2003) Direct evidence is evidence that, if believed by the trier of fact, would prove discriminatory conduct on the part of the employer without reliance on inference or presumption. *Id.* Direct evidence "essentially requires an admission by the decision-maker that his actions were based upon the prohibited animus." *Id.* (quoting *Rogers* v. *City of Chicago*, 320 F.3d 748,

21

753 (7th Cir. 2003)). A plaintiff can also prevail under the direct method by presenting a "convincing mosaic" of circumstantial evidence that points directly to a discriminatory reason for the employer's action. *Id.* (citing *Adams* v. *Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003)).

If a plaintiff cannot prevail under the direct method of proof, he may proceed under the indirect method, *i.e.*, the *McDonnell Douglas* test. For claims of discrimination in the terms and conditions of work, denial of promotion, and termination, a plaintiff must make a *prima facie* showing that (1) he was a member of a protected class; (2) he performed his job according to the employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) the employer treated similarly situated employees outside of the protected class more favorably. *Foster* v. *Arthur Andersen, LLP*, 168 F.3d 1029, 1035 (7th Cir. 1999). For claims of retaliation, the plaintiff satisfies the first prong of the test by making a *prima facie* showing that he engaged in a statutorily protected activity. *Hilt-Dyson* v. *City of Chicago*, 282 F.3d 456, 465 (7th Cir. 2002).

Once established, a "*prima facie* case creates a rebuttable presumption of discrimination, and the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its allegedly biased employment decision." *Johnson* v. *City of Fort Wayne, Ind.*, 91 F.3d 922, 931 (7th Cir. 1996). If the employer meets its burden of production, the presumption dissolves, and the plaintiff then must demonstrate that the nondiscriminatory explanation of the employer is pretextual. *Id.* Pretext means a lie. *Id.*

In their response to Arrow's motion for summary judgment, plaintiffs repeatedly recite a list of allegedly discriminatory events followed by the conclusional assertion that the events

22

demonstrate that plaintiffs were terminated because of their race, retaliated against, subjected to different terms and conditions of work, and subjected to a racially hostile work environment. Only in the final six pages of their thirty-page response do plaintiffs attempt to apply the law to the facts. (Pl. Resp. to Def. Mot. for Summ. J., at 24-30, "Application of Existing Legal Standards to Plaintiffs.") In those pages, plaintiffs simply state the *McDonnell Douglas* test, cite to a few purportedly representative facts from the record "in the interest of efficiency," and claim that they have met their burden. Apparently, plaintiffs believe that the facts alleged speak for themselves. They do not.

To withstand a motion for summary judgment, the non-moving party must demonstrate to the court that there is a genuine issue of material fact regarding an outcome determinative issue for each individual claim in the complaint. *See Celotex Corp.*, 477 U.S. at 324; *Insolia*, 216 F.3d at 598. Plaintiffs have failed to do this for any of their discrimination claims. First, although plaintiffs suggest that the record contains direct and circumstantial evidence of racial discrimination sufficient to satisfy the requirements of the direct method of proof, they fail to explain to what evidence they are referring. The court declines to construct plaintiffs arguments for them.

Second, plaintiffs fail to establish a *prima facie* case for any of the acts of discrimination alleged. For example, in support of their claim that they were denied promotions because of their race, plaintiffs argue that they

> . . . have presented a *prima facie* case of discrimination by showing that they belong to a protected group, African-American. This is uncontested. They made known their interest in a management position to both Hammann and Fagan on multiple occasions and were passed over for promotions in favor of other less qualified non-black individuals.

23

In the case of Plaintiff Burks, less qualified non-blacks such as Andy Bellavia, Allen Mahea, Mogee, Bob Hammann, Andy Mahares, Kelly Zimmerman, and Mickey Ellison were promoted ahead of him, regardless of experience. Despite Burks request for promotions, he was passed over on multiple occasions.[6]

(Pl. Resp. to Def. Mot. for Summ. J., at 25.) Based on this statement, plaintiffs claim that a "presumption of discrimination has arisen." (*Id.*)

There are two problems with plaintiffs' argument. First, the passage fails to mention Scott or Williams, leaving the court to scour the record for facts that might support their claims that they were denied promotions because of their race. As far as the court can determine, plaintiffs have presented no facts that would support Scott's or Williams' claims that they were denied promotions because of their race.[7]

Second, despite their claim to the contrary, plaintiffs have failed to establish a *prima facie* case that Burks was denied promotions because of his race. To establish a *prima facie* case of race discrimination in a failure-to-promote context, the employee must show that (1) he belongs to a protected class; (2) he applied for and was qualified for the position sought; (3) he was rejected for that position; and (4) the employer granted the promotion to someone outside of the

---

[6]Plaintiffs conclude this paragraph with the allegation that Gary Dunn told Burks that, "anything lighter than a paper bag was accepted at their dealership." (Pl. Resp. to Def. Mot. for Summ. J., at 25, citing Pl. Stat. of Add'l Facts ¶ 37.) However, Dunn's comment occurred sometime in 1996 or before, and Dunn did not work at Arrow during Burks' last period of employment there. Therefore, Dunn's statement has no bearing on whether Burks was denied promotions because of his race during his final period of employment. *See Geier* v. *Medtronic, Inc.*, 99 F.3d 238, 242 (7th Cir. 1996)(If the discriminatory remarks are not "contemporaneous with the [adverse employment action] or causally related to the [adverse employment] decision," they are insufficient to create a triable issue of material fact regarding discrimination.).

[7] Williams claims that he was passed over for promotion by several white employees. (Pl. Stat. of Add'l Facts ¶ 52.) Williams then wrote a letter to Fagan on February 5, 1999, asking why five white employees had been promoted to managerial positions ahead of him. (*Id.* ¶ 46.) These events occurred more than 300 days before Williams filed his EEOC charge and more than two years before he filed his complaint in the instant case. Because failure to promote is considered a discrete discriminatory act, *Morgan*, 536 U.S. at 114, any claim for failure to promote based on these events is time-barred.

24

protected group who was not better qualified than the employee. *Grayson* v. *City of Chicago* 317 F.3d 745 (7th Cir.2003). In support of (2), Burks has only generalized assertions that he applied for promotions, and his sole evidence for the fourth prong of the test is his own deposition testimony that "other less qualified non-black persons were promoted over him such as Andy Bellavia, Allen Mahea, Mogee, Bob Hammann, Andy Mahares, Kelly Zimmerman, Mickey Ellison." (Pl. Stat. of Add'l Facts ¶ 36.). Burks' self-serving statements are insufficient to defeat a motion for summary judgment. The Seventh Circuit has made clear that a motion for summary judgment is the "put up or shut up" moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events. *Schact* v. *Wisconsin Dep't of Corr.*, 175 F.3d 497, 503-04 (7th Cir. 1997), *rev'd on other grounds*, 524 U.S. 381 (1998). Burks has failed to present any evidence that would convince a trier of fact to accept his version of events. Most obviously, he has failed to provide the court with any facts regarding a single promotional opportunity, such as the qualifications of those employees who received promotions. Without such facts, Burks cannot establish that the employees that received promotions were "not better qualified" than Burks. Thus, the court holds that plaintiffs have failed to establish a *prima facie* case that they were denied promotions because of their race.

Plaintiffs have similarly failed to establish a *prima facie* case that they were discriminated against in pay, leave, training, or bonuses. The only evidence plaintiffs offer to support these claims is their own deposition testimony that they were discriminated against. For example, plaintiffs argue that "favorable treatment was prevalent at Arrow, in pay, demo assignments, leave, spiffs, and many other categories." (Pl. Resp. to Def. Mot. for Summ. J., at 27.) In support, plaintiffs cite to the following paragraphs from their Statement of Additional Facts:

25

32) Arrow Chevrolet favored whites over minorities in awarding spiffs, bonuses and in contest [*sic*] (Burks dep. at 103, line 1-3).

33) Arrow Chevrolet made up the rules for awarding spiffs as they went along. (Burks dep. at 104, line 12-13). Arrow Chevrolet ran contests where the prize would be a spiff in such contests management helped other employees to win.

38) Non-minority managers received more thorough and complete training in their new management rolls [*sic*]. (Burks dep. at 125, line 4-6).

None of these statements is sufficient to defeat a motion for summary judgment. Again, to defeat a motion for summary judgment, the non-moving party cannot rest on bare pleadings alone but must identify *specific facts* showing that there is a genuine issue for trial. *See Celotex Corp.*, 477 U.S. at 324; *Insolia*, 216 F.3d at 598. Plaintiffs have failed to provide the court with any specific facts. The statements above hardly rise above "bare pleadings."

To cite another example, Scott claims that Arrow paid white finance managers more than him because of his race. Scott admits that he and all other new finance managers received a 3% commission on the total revenue generated by the finance department. However, he claims that other finance managers were "given additional perks." (Pl. Resp. to Def. L.R. 56.1 ¶ 64.) He fails to explain what these "additional perks" were or who received them. His bare assertion that other employees received additional perks is insufficient to defeat a motion for summary judgment on the issue.

"In the interest of efficiency," the court will not detail plaintiffs failures on each claim of discrimination in the terms and conditions of work. Suffice it to say that plaintiffs have failed to present any facts that could convince a jury to accept their conclusional allegations that Arrow

discriminated against them in the terms and conditions of employment and denied them promotions, training, or bonuses because of their race.[8]

Plaintiffs similarly fail to establish a *prima facie* case that they were terminated because of their race. To establish a *prima facie* case, plaintiffs must show, among other things, that the employer treated similarly situated employees outside of the protected class more favorably. *Foster*, 168 F.3d at 1035. Plaintiffs have made no attempt to show that they were terminated for behavior for which non-black employees were not terminated. Again, they simply rely on the blanket allegation that "favorable treatment was prevalent at Arrow, in pay, demo assignments, leave, spiffs, and many other categories." (Pl. Resp. to Def. Mot. for Summ. J., at 27.) For the reasons explained above, this allegation is insufficient to defeat a motion for summary judgment.

Because plaintiffs fail to make out a *prima facie* showing, the defendant has no burden to articulate a legitimate, nondiscriminatory reason for the employment action. But even assuming a *prima facie* case of discriminatory termination, plaintiffs fail to offer any substantial argument that Arrow's stated reasons for terminating plaintiffs are pretextual. Plaintiffs apparently believe that the burden is on Arrow to demonstrate that its stated reasons for terminating plaintiffs were the real reasons. This is not so.

Arrow claims that it terminated Burks because he failed to report to work following a dispute over damage Arrow claims Burks caused to his demo vehicle. Arrow claims that Scott's position in the finance department was terminated because Scott's sales were "slipping." Arrow

---

[8]Williams claims that Gus Kay, whose position is not identified, asked him what part of Chicago he lived in prior to assigning him a demo. Kay told Williams that he was only eligible for a certain type of car because of where he lived. (Pl. Stat. of Add'l Facts ¶ 54.) Plaintiffs claim that this is "profiling." However, plaintiffs admit that Williams drove a Monte Carlo in 1999 and 2000, the only period at issue in this case. A Monte Carlo is a "high-end demo." Thus, even if being assigned a low-quality demo can be considered an adverse employment action, Williams was clearly not subjected to it.

27

claims that it offered Scott a position in sales, but he declined. Arrow claims that it terminated Williams following a dispute concerning a complaint from a customer regarding a car deal in which Williams had worked.[9] Because Arrow has articulated legitimate, nondiscriminatory reasons for terminating plaintiffs, "the presumption of discrimination extinguishes, and the burden shifts back to the plaintiff to persuade the trier of fact either directly that a discriminatory reason more likely motivated the action or indirectly that the employer's articulated reason for the employment action is unworthy of credence, but merely a pretext for intentional discrimination. At all times, the ultimate burden of persuasion remains with the plaintiff." *Nawrot* v. *CPC Intern.*, 277 F. 3d 896, 905-06 (7th Cir. 2002).

While plaintiffs repeatedly claim that Arrow's stated reasons for terminating them are pretextual, they point to no specific evidence that could convince a trier of fact of this. A bare contention that an issue of fact exists is insufficient to create a factual dispute. *Bellaver*, 200 F.3d at 492. Thus, plaintiffs have failed to meet their burden of production.

Scott's and Williams' claims of retaliatory termination also fail. Scott's claim that Arrow retaliated against him because he agreed to support Burks in filing a charge of discrimination against Arrow is contradicted by Scott's own deposition testimony. Scott testified that before he was terminated, he had no knowledge that Burks was going to file a discrimination charge against Arrow. Thus, he could not have agreed to support Burks in such a charge before he was terminated. Plaintiffs fail to offer any argument in support of Williams' claim that he was terminated in retaliation for making protected complaints about racial and religious

---

[9]Arrow claims that plaintiffs were not terminated but voluntarily left their employment at Arrow. For the purposes of this motion, the court accepts plaintiffs' claims that they were terminated.

discrimination, and the record reveals little that would support such a conclusion. A short period of time between a protected activity and an allegedly retaliatory action may permit a plaintiff to survive summary judgment "provided that there is also other evidence that supports the inference of a causal link." *Lang* v. *Illinois Dept. of Children and Family Services*, No. 03-2463, slip op. at 6 (7th Cir. March 17, 2004). Here, there is no evidence except the period of time between Williams' complaints and his termination to support the inference of a causal link.

### B. Hostile Work Environment

Plaintiffs also neglect to offer any argument in support of their hostile work environment claims, and the court can find no evidentiary support for those claims in the record. To establish that an employer subjected a plaintiff to a hostile work environment, the plaintiff must show that (1) he was subjected to unwelcome harassment; (2) the harassment was based on his race; (3) the harassment unreasonably interfered with his work performance by creating an intimidating, hostile or offensive working environment that seriously affected their psychological well-being; and (4) there is a basis for employer liability. *Parkins* v. *Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1032 (7th Cir. 1998). In typical cases, the question is whether quantity, frequency, and severity of the racial slurs create a work environment so hostile as to discriminate against the minority employee. *Vore* v. *Indiana Bell Telephone Co.*, 32 F.3d 1161, 1164 (7th Cir. 1994). As the language of the test makes clear, to recover on a hostile work environment claim, each individual plaintiff must satisfy each element of the test.

While Burks alleges that he was "subjected to racial statements" during previous periods of employment, he fails to cite to a single instance of "unwelcome racial harassment" during his

29

final period of employment. Thus, he cannot establish that Arrow subjected him to a hostile work environment.

Williams alleges that he was subjected to racial slurs on a daily basis while he worked at Arrow. (Def. L.R. 56.1 ¶ 57.) This single statement, without more, is insufficient to defeat a motion for summary judgment on Williams' racially hostile work environment claim. Williams fails to identify who made the slurs or what words were used or to explain how the slurs affected him. This information is necessary for the court to determine if there is a genuine issue of material fact as to whether Arrow subjected Williams to a racially hostile work environment. Without it, Williams cannot establish that Arrow subjected him to a racially hostile work environment.

Williams also claims that he was subjected to a hostile work environment because of his religion. The record reveals two events that plaintiffs could be relying on to support Williams' claim that he was subjected to a hostile work environment because of his religion. First, the pork chops incident involving Jimmy Samhan (Pl. Stat. of Add'l Facts ¶ 49) and, second, the vulgar remark Arrow business manager Bob Williams made concerning a Muslim woman customer. (*Id.* ¶ 51.) To establish a hostile work environment claim, a plaintiff must show that the harassing words or conduct were "severe or pervasive." *See Quantock* v. *Shared Marketing Servs., inc.*, 312 F.3d 899, 903-04 (7th Cir. 2002). While the events described by Williams were certainly crude and insensitive, two objectionable statements do not constitute "severe or pervasive" as a matter of law. *See Faragher* v. *City of Boca Raton*, 524 U.S. 775, 788 (1998)("Simple teasing, offhand comments, and isolated incidents (unless extremely serious)" insufficient to create a hostile work environment); *Ngeunjuntr* v. *Metropolitan Life Ins. Co.*, 146 F.3d 464, 467-68 (7th

30

Cir. 1998)(relatively isolated comments suggesting bias against racial minorities not sufficient to survive summary judgment); *compare Daniels* v. *Essex Group, Inc.*, 937 F.2d 1264 (7th Cir. 1991)(finding a hostile work environment where employee was repeatedly subjected to "nigger" jokes and racially hostile graffiti specifically invoking the Ku Klux Klan, and witnessed a battered, bloody black dummy hung from a doorway).

Scott admits that no one other than Hammann ever directed racial slurs at him. He claims that Hammann would joke about O.J. Simpson, Michael Jackson, Louis Farrakhan and Al Sharpton. He also claims that he heard Jimmy Samhan ask a group of African-American employees if they were having a Gangster Disciples meeting. Finally, he claims that he heard Samhan refer to a customer as a "nigger." (Def. L.R. 56.1 ¶ 72.) Although this type of conduct is objectionable and could support a hostile environment claim if severe and pervasive, as well as unwelcome, here the evidence is so generalized, without reference to context, frequency, or duration, no reasonable jury would be able to discern whether these events were "severe or pervasive" or merely offhand or isolated remarks of the sort described in *Faragher*. Thus, given the facts of record, Scott cannot establish that he was subjected to a racially hostile work environment.[10]

---

[10]Plaintiffs fail to offer any evidence connecting Scott's "skeletal muscle spasms" to a racially hostile work environment.

31

## CONCLUSION

For the reasons stated above, Arrow's motion for summary judgment is granted (#48).

The clerk is instructed to enter judgment in favor of the defendant. Case is terminated.

ENTER: _____
JOAN HUMPHREY LEFKOW
United States District Judge

Dated: March 23, 2004